FILED
John E. Triplett, Acting Clerk
United States District Court

By MGarcia at 4:51 pm, Oct 16, 2020

# In the United States District Court
# for the Southern District of Georgia
# Waycross Division

CHRISTOPHER BRYAN STEWART,

    Plaintiff,

    v.

EDWINA JOHNSON, ELIZABETH
BOWLES, TOM GRAMIAK, CAPTAIN
ADAMS, LT. BURSE, LT. BAGLEY,
SGT. PAYNE, and TIFFANY LEE,

    Defendants.

CV 5:18-037

## ORDER

Before the Court is Defendants' Motion for Summary Judgment. Dkt. No. 32. The motion is fully briefed, dkt. nos. 42, 54, and with the benefit of a hearing and additional briefing, dkt. nos. 60, 61, is ripe for review. For the reasons below, Defendants' Motion for Summary Judgment is **GRANTED in part** and **DENIED in part**.

## BACKGROUND

Plaintiff Christopher Stewart brings this action under 42 U.S.C. § 1983 and the Eighth and Fourteenth Amendments, claiming Defendants failed to protect him from two assaults by other inmates in April 2016. Dkt. No. 1 at 1–2. At the time of the incidents giving rise to this action, Plaintiff was an inmate at Ware State

Prison ("WSP") and in the custody of the Georgia Department of Corrections ("GDC"). Id.

Defendants were employees of GDC and working at WSP at the time of the incidents. Their roles were as follows: Thomas Gramiak, Warden of WSP; Edwina Johnson, Deputy Warden of Care and Treatment; Elizabeth Saenz (also known as Bowles), Grievance Coordinator; Tiffany Lee, Grievance Coordinator; Brian Adams, Captain and Chief of Security; Steve Burse, Lieutenant Corrections Officer; Mark Bagley, Lieutenant; and Mack Payne, Sergeant. Dkt. No. 32-1 ¶ 1.

Plaintiff was assaulted twice while imprisoned at Ware State Prison. See id. ¶¶ 3-6. The first assault occurred on April 20, 2016 in the day room of Dorm A-2. Id. ¶ 3. At that time, Plaintiff was assaulted by an inmate whom he alleges acted on behalf of the Muslims or the Bloods—both known as gangs within the Georgia prison system. Dkt. No. 1 ¶¶ 15, 16, 51. Plaintiff alleges that he injured his right eye, and, as a result, lost central vision in that eye. Id. ¶¶ 52, 56. The second assault occurred on April 25, 2016, in a two-person administrative segregation cell. Dkt. No. 32-1 ¶¶ 5-6. During the incident, Plaintiff was attacked by his cellmate while he was asleep. Dkt. No. 1 ¶ 73. As a result, Plaintiff suffered a serious head injury and was taken to the hospital for treatment. Id. ¶¶ 77, 79.

In the weeks leading up to these two attacks, Plaintiff alleges that he put several prison officers and officials on notice

2

of threats against his safety and life. Id. ¶¶ 15–50. Plaintiff first alleges that, on April 8, 2016, he gave notice of threats made against him the previous day, April 7, to non-party Floor Officer Ruger. Id. ¶ 31b. Plaintiff alleges that he told Officer Ruger what happened both verbally and in writing. Dkt. No. 32-11. Specifically, Plaintiff claims that he told Officer Ruger that on April 7, 2016, he was surrounded and threatened by ten to fifteen Muslim inmates in the A-2 dorm dayroom. Dkt. No. 62-1 ¶ 7a. Plaintiff claims that the threats occurred after he had a verbal altercation with a Muslim inmate regarding use of a contraband cell phone. Id. Following the altercation, Plaintiff claims the leader of the Muslims ordered his fellow Muslims to assault Plaintiff if Plaintiff "said anything smart." Dkt. No. 32-11 at 10. According to Plaintiff, the Muslim leader made specific threats, including, "We'll kill you, cracker." Dkt. No. 62-1 ¶ 7d. Plaintiff contends that the incident was recorded on video surveillance and that he requested the guards pull the video and review it. Id. ¶ 7e. Plaintiff further contends that he requested prison officials remove the Muslim leader from general population or, in the alternative, that Plaintiff be removed from general population, removed from dorm A-2, or transferred to a different prison facility. Id. ¶ 7f.

Plaintiff contends that Officer Ruger, upon notice of these events from Plaintiff, notified Lieutenant Bagley, who instructed

Officer Ruger to call Defendant Payne. Id. ¶ 8d. Plaintiff
testified that Officer Ruger did so and that Sergeant Payne came
to the dorm hours later but did not review the videotape of the
incident. Dkt. No. 32-11 at 19. Plaintiff has never directly
interacted with Defendant Bagley or Defendant Payne. Dkt. No. 62-
1 ¶ 8d.

Plaintiff next alleges that, on April 13, 2016, he gave
notice of threats made against him to nonparty Floor Officer
Self by handing her a note that contained all the information
above, including the lack of response by Sgt. Payne and Lt.
Bagley. Id. ¶ 8. Plaintiff also contends he told Officer Self,
through his note, that since the April 7, 2016 incident,
Plaintiff had been labeled a "snitch" by other inmates at WSP
after "a large number of [them]" read an open control log
wherein Officer Ruger recorded Plaintiff's report of the
Muslims' threats against him. Id. ¶ 8e. Plaintiff alleges that
his note provided Officer Self with notice that, because he had
been labeled a snitch, he was now "a target for all gang members
at WSP" and he was "specifically being targeted by two gangs,
the Muslims and the Bloods." Id. ¶ 8f-g. He further contends
that his note conveyed to Officer Self that "the Muslims were
making plans for [him] to be stabbed" and that the leader of the
Bloods, nicknamed "Big J," had "ordered that [he] be assaulted."
Id. ¶ 8h-i. Plaintiff says he identified both the leader of the

4

Muslims and the leader of the Bloods by dorm and room number.
Id. Plaintiff claims he notified Officer Self that he "stopped
eating breakfast for fear of being stabbed" in the crowd and had
"begun taking a weapon—a lock in a sock—to meals because [he]
was afraid of being attacked." Id. ¶ 8l. Finally, Plaintiff
alleges that his note put Officer Self on notice that on April
13, 2016, as Plaintiff entered the "small yard" for pill call,
at least five inmates asked him to come to the "main walk" for a
talk; Plaintiff believed those inmates were, in fact, going to
attack him because "the windows in the adjoining building [were]
full of inmates, suggesting [they] knew [he] was going to be
attacked." Id. ¶ 8k.

This second allegation of notice is somewhat inconsistent
with Plaintiff's deposition testimony. There, when asked "[w]hat
specific notice" Defendant Burse would have received, Plaintiff
answered:

> On the evening of the thirteenth, Floor Officer Ms. Self,
> I advised her that some gang members out on the sidewalk
> wanted me to come out there and talk to them. They was
> wanting to assault me is what it was. So I went in and
> told her to notify her lieutenant about my safety. She
> said she would notify the Lieutenant Burse . . . She
> notified him and nothing happened.

Dkt. No. 32-11 at 14-15. Plaintiff contends he knows Lieutenant
Burse received notice of at least the incident in the main walk
because Lieutenant Burse asked him the following morning: "Are you
the one that wrote that note last night[?]" Id. at 18. It was

during this conversation that Lt. Burse allegedly said she would "tell Captain Adams." Id.

Third, Plaintiff alleges that he gave notice of threats made against him to Warden Gramiak, Deputy Warden of Care Johnson, Coordinator Bowles, and Coordinator Lee by filing a grievance on April 14, 2016. Dkt. No. 1 ¶¶ 28, 44. In this April 14, 2016 grievance, Plaintiff stated the following:

> (Date of incident 4/7/16)[.] This is an emergency grievance. I have a situation involving a significant threat to my health that requires prompt action. This emergency grievance (involves allegations of physical abuse with significant injury to my person) . . . meet[s] the G.D.C. criteria to be processed as an [emergency grievance]. . .
>
> [This grievance can be resolved by having] the gang leader that ordered the Muslims to attack me . . . removed and extracted from general population in W.S.P., A-2, 21 . . . or . . . place me in a safe dorm, where there is no gang activity . . .
>
> [On April 8] I . . . supplied floor officer Ms. Ruger with a written "notice" about [an event on April 7 namely,] the gang leader of the Muslim's [sic] housed in A-2, 21 (Dorm Rep.) . . . "ordered" the Muslims to "assault" me if I said anything smart. . . He need's [sic] to be extracted from general population in W.S.P., A-2 . . . [Videotape of the incident] would "clearly" show me being surrounded by about 10 to 15 offenders with the person listed in this grievance as leading this disturbance and possible future assault . . .
>
> Later in the day offender Timothy Henry[,] A-2, 12-B[,] approached me and said: "I know what you did." I asked him, ["W]hat do you mean?["] He stated[,] "I read the officer's log book, they left it open and I read it through the window." . . . Now the whole dorm knows that I reported this gang activity against me. This has made my living conditions "extremely" "dangerous!" . . . I am now labeled a "snitch"! This label placed on my person

makes me a "target" to "all" gang members at W.S.P. A source has told me that the "Muslim's" [sic] are making plan's [sic] to have me "wet up," meaning <u>stabbed</u>! . . .

A "new" gang leader of the "Blood's" [sic] known as Big "J" has been placed in . . . dorm A-2, 14. The [same] source informed [me] that Big "J" stated that: "If his new cell phone get's taken from him because of me, that he will have me "smashed . . . because I'm a snitch." This assault is to take place when I'm placed into another dorm, or if the Muslims leader get's extracted from A-2 because of me. Then at that time, I will be attacked! . . . I . . . will stop attending breakfast . . . for . . . fear of getting stabbed . . .

[The W.S.P. guards have] allow[ed] the general population at W.S.P. to know that I "snitched" on them. This may get me killed!!! . . .

This all started over a dispute about using one of the Muslim's cell phones. The Pakastani [sic], Muslim offender who lives in W.S.P. A-2, 7-B has a cell phone. He only pull's [sic] it out when [certain] officers are not working. The Muslims [and] Bloods know I known their business about their cell phones. So when [and] if you take them[,] know that they will want to kill me. . .

Please . . . ship me to Walker State Prison so I may attend their faith base program. We are in the last day's [sic] so I want to be a part [of] their spiritual program[] or ship me to Phillips. Get me out of Ware State Prison before I get killed!

Dkt. No. 32-2 at 6-12. Within the same grievance, Plaintiff also specifically requested the following:

MOVE ME TO "I" or "L" [building][1] or any [other] prison . . . **DO NOT** place me in administrative segregation or protective custody for that would impose overly restrictive conditions upon me, causing me no "access" to the law library or my legal assistant . . . to assist me in my non-frivolous habeas corpus [case] . . . which is scheduled for court in 90 days. . .

---

[1] At the time of his grievance, Plaintiff believed there were no gang members in either of these dorms.

Id. The same day Plaintiff filed his grievance, Defendant Elizabeth Bowles (Hereinafter "Defendant Saenz") rejected it procedurally "due to offender grieving more than one issue." Id. at 14.

Plaintiff also testified that Warden Gramiak was aware of events alleged in the grievance because, as head of the institution, Gramiak "would be aware of this document." Dkt. No. 32-11 at 17. Finally, Plaintiff alleges that he gave notice of threats against his safety and life to Warden Gramiak on April 20, 2016. See id. ("When the guy whacked me in the head[, they] took me to . . . a little medical room . . . Mr. Gramiak came in there . . . [and] I made him aware at that point in that room as to what happened . . . I told him straight from my mouth what happened.").

## LEGAL STANDARD

A court shall grant summary judgment when the evidence presented to the court by the movant demonstrates there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" where the evidence would allow "a reasonable jury to return a verdict for the nonmoving party." FindWhat Inv. Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). A fact is "material" only if it "might affect the outcome of the suit under the governing law." Id. (quoting Anderson, 477 U.S. at 248). When reviewing the record, the trial court need not accept or give

8

credit to conclusory allegations that are not supported by physical evidence, medical records, or corroborating witness testimony. See Bennett v. Parker, 898 F.2d 1530, 1533-34 (11th Cir. 1990). Moreover, irrelevant, unnecessary, or unsupported facts are not material and, therefore, cannot create a genuine dispute of material fact. See Anderson, 477 U.S. at 248.

The moving party bears the initial burden of demonstrating that a genuine dispute of material fact does not exist. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). To do so, the movant must show the court that the nonmovant lacks the evidence necessary to support its case. See id. at 325. "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990).

If successful, the burden shifts to the nonmovant, who must go beyond his pleadings and present affirmative evidence showing that a genuine dispute of material fact exists. See Anderson, 477 U.S. at 257. The nonmovant may satisfy this burden in one of two ways. First, the nonmovant may show the court that the record before it contains sufficient evidence for the nonmovant's claim to survive a directed verdict motion. Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1116 (11th Cir. 1993). Second, the nonmovant may come forward with additional evidence beyond its original

9

pleadings to make its case. Walker, 911 F.3d at 1576–77 ("A party opposing summary judgment may not rest upon the mere allegations or denials in its pleadings. Rather, its responses, either by affidavits or otherwise . . . must set forth specific facts showing that there is a genuine issue for trial.").

If the nonmoving party cannot show that there is a dispute of material fact or that the movant is not entitled to summary judgment as a matter of law, then the court must find in favor of the movant. Morris v. Ross, 663 F.2d 1032, 1034 (1981) (in such cases, summary judgment in favor of the movant is "not only proper but required").

## DISCUSSION

### I. Qualified Immunity

Defendants argue that the Court should grant their motion for summary judgment because Plaintiff's claims are barred by qualified immunity. Dkt. No. 54 at 15.

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Pearson v. Callahan, 555 U.S. 223, 232 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). To be entitled to qualified immunity, a government official must first demonstrate that "he was acting within the scope of his discretionary authority

10

when the allegedly wrongful acts occurred." <u>Rich v. Dollar</u>, 841 F.2d 1558, 1563-64 (11th Cir. 1988) (citations omitted).

If a defendant satisfies this burden, then the Court must grant qualified immunity unless the plaintiff can demonstrate: (1) that the defendant's alleged actions violated a constitutional or statutory right; and (2) that such a right was clearly established. <u>Bogle v. McClure</u>, 332 F.3d 1347, 1355 (11th Cir. 2003). Courts have the discretion to determine which of these two prongs it will address first. <u>See</u> <u>Pearson</u>, 555 U.S. at 232; <u>see also</u> <u>Williams v. Russo</u>, 636 F. App'x 527, 532 (11th Cir. 2016).

## A. Discretionary Authority

Discretionary authority includes all actions of a government official that "(1) were undertaken pursuant to the performance of his duties, and (2) were within the scope of his authority." <u>Dang ex rel. Dang v. Sheriff, Seminole Cnty.</u>, 871 F.3d 1272, 1279 (11th Cir. 2017) (quoting <u>Rich</u>, 841 F.2d at 1564). Plaintiff has conceded that all Defendants were acting within their discretionary authority, but he contests qualified immunity on the grounds discussed below. <u>See</u> Dkt. No. 42. at 3 n.3 ("Plaintiff does not dispute that Defendants were acting in their discretionary capacities.").

## B. Constitutional Violation

Because Defendants acted within the scope of their discretionary authority, the burden shifts to Plaintiff to show

11

that qualified immunity does not apply. <u>Dang</u>, 871 F.3d at 1279. Plaintiff must "prove that the facts alleged, construed in the light most favorable to [him], establish that a constitutional violation did occur." <u>Shaw v. City of Selma</u>, 884 F.3d 1093, 1099 (11th Cir. 2018) (citing <u>Smith v. LePage</u>, 834 F.3d 1285, 1291 (11th Cir. 2016)).

Here, Plaintiff claims that Defendants failed to protect him from assaults by other inmates in violation of his Eighth and Fourteenth Amendment constitutional rights. <u>See</u> Dkt. No. 1 at 2. Plaintiff brings these claims under 42 U.S.C. § 1983, which provides a cause of action for damages against every person who, acting under the color of state law, deprives another of "rights, privileges, or immunities secured by the Constitution and laws" of the United States. 42 U.S.C. § 1983. In other words, section 1983 provides a "method of vindicating federal rights elsewhere conferred" upon a plaintiff. <u>Albright v. Oliver</u>, 510 U.S. 266, 271 (1994) (citations omitted). The Court determines the success of a plaintiff's section 1983 claim "by reference to the specific constitutional standard that governs that right." <u>Id.</u>

Plaintiff's "failure to protect" claim arises under the Eighth and Fourteenth Amendments.[2] <u>Farmer v. Brennan</u>, 511 U.S. 825,

---

[2] The same standard and analysis applies under either amendment. <u>See, e.g.</u>, <u>H.C. v. Jarrard</u>, 786 F.2d 1080, 1084-87 (11th Cir. 1986). For the sake of clarity, the Court will construe Plaintiff's complaint as a claim that his Eighth Amendment rights were violated.

828 (1994). Inherent in the Eighth Amendment's right to be free from the infliction of cruel and unusual punishment is an inmate's right to be free from violence at the hands of other inmates. Farmer, 511 U.S. at 833. This right imposes a duty on facility officials to protect inmates from such violence. Id. That said, not "every injury suffered by one inmate at the hands of another" translates into a "constitutional liability for prison officials responsible for the victim's safety." Id. at 834. Specifically, "[t]o survive summary judgment on a deliberate indifference failure-to-protect claim, 'a plaintiff must produce sufficient evidence of (1) a substantial risk of serious harm; (2) the defendants' deliberate indifference to that risk; and (3) causation.'" Caldwell v. Warden, TCI Talladega, 748 F.3d 1090, 1099 (11th Cir. 2014) (quoting Goodman v. Kimbrough, 718 F.3d 1325, 1331 (11th Cir. 2013)); see also Lane v. Philbin, 835 F.3d 1302, 1307 (11th Cir. 2016) (quoting Hale v. Tallapoosa Cnty., 50 F.3d 1579, 1582 (11th Cir. 1995)). Before applying the law to Plaintiff's claims, the Court will explain what Plaintiff must show for each of these elements.

### i. Substantial Risk of Serious Harm

For a plaintiff to successfully bring an Eighth Amendment claim for deliberate indifference, a plaintiff must show that the "risk of inmate-on-inmate violence" at the prison was "excessive." See Purcell ex rel. Estate of Morgan v. Toombs Cnty., 400 F.3d

1313, 1320 (11th Cir. 2005). A plaintiff does this by showing that the risk was substantial and the threatened harm was serious. For there to be a substantial risk, the plaintiff must show that, when viewed objectively, "there must be more than a mere possibility of serious harm; instead, there must be a strong likelihood." Turner v. Burnside, 444 F. App'x 394, 396 (11th Cir. 2011) (citing Edwards v. Gilbert, 867 F.2d 1271, 1276 (11th Cir. 1989)); see also Caldwell, 748 F.3d at 1099 (explaining there must be more than a speculative, theoretical, or insignificant risk of some harm).

For the Court to find a threat of serious harm, a plaintiff must show that the risk is serious; mere discomfort, without more, is not enough. See Hunt v. Warden, 748 F. App'x 894, 900 (11th Cir. 2018). For example, "a prisoner's exposure to the potential for a fight does not, in and of itself, constitute [a] substantial risk of harm." Estate of Owens v. GEO Group, Inc., 660 F. App'x 763, 767 (11th Cir. 2016). Instead the threat of violence must be "extreme:" it must create an "unreasonable risk of serious damage to the prisoner's health or safety." Richardson v. Johnson, 598 F.3d 734, 737 (11th Cir. 2010).

### ii. Deliberate Indifference to Risk

If a substantial risk of serious harm exists, the inquiry turns to the second element: deliberate indifference. See Rodriguez v. Sec'y Dep't of Corr., 508 F.3d 611, 617 (11th Cir. 2007). The deliberate indifference element is comprised of a

14

subjective component and an objective component. See Caldwell, 748
F.3d at 1099. A prison official acts with deliberate indifference
"when he actually (subjectively) knows that an inmate is facing a
substantial risk of serious harm, yet disregards that known risk
by failing to respond to it in an (objectively) reasonable manner."
Rodriguez, 508 F.3d at 617.

   To prove the subjective component, a plaintiff must show that
the prison official was "both aware of the facts from which the
inference could be drawn that a substantial risk of serious harm
exists, and must also draw that inference." Farmer, 511 U.S. at
837. Moreover, "the known risk of injury must be a strong
likelihood, rather than a mere possibility before a guard's [or
other official's] failure to act can constitute deliberate
indifference." Doe v. Ga. Dep't of Corr., 245 F. App'x 899, 903
(11th Cir. 2007) (quoting Brown v. Hughes, 894 F.2d 1533, 1537
(11th Cir. 1990)).

   "Whether a prison official had the requisite knowledge of a
substantial risk is a question of fact subject to demonstration in
the usual ways, including inference from circumstantial evidence."
Bowen, 826 F.3d at 1321 (citing Farmer, 511 U.S. at 842). The trier
of fact may consider the "degree of specificity" of the facts
subjectively known to the defendant in determining whether the
defendant knew the risk was serious and the harm substantial. Id.
at 1322. Additionally, the trier of fact may also "conclude that

the prison official knew of a substantial risk [of serious harm] from the very fact that the risk was obvious." Id. (citing Farmer, 511 U.S. at 842).

To prove the objective component, a plaintiff must show that the defendant disregarded the substantial risk by "failing to respond to it in an (objectively) reasonable manner." Rodriguez, 508 F.3d at 616. A prison official responds to a known risk of serious harm in an objectively unreasonable manner if he "knew of ways to reduce the harm but knowingly declined to act" or "knew of ways to reduce the harm but recklessly declined to act." Id. at 619-20. Of note, if a prison official responds in a reasonable manner, there is no Eighth Amendment violation, even if the harm was not averted. Farmer, 511 U.S. at 844. Finally, and importantly, under section 1983, mere negligence is not enough to show that a defendant acted with deliberate indifference. See Goodman v. Kimbrough, 718 F.3d 1325, 1334 (11th Cir. 2013) ("Were we to accept [a negligent] theory of liability, the deliberate indifference standard would be silently metamorphosed into a font of tort law— a brand of negligence redux—which the Supreme Court has made abundantly clear it is not.").

### iii. Causation

Finally, a plaintiff must prove "a causal connection between the prison official's conduct and the Eighth Amendment violation." Rodriguez, 508 F.3d at 617. In other words, the plaintiff must

present evidence of how the prison official's deliberate indifference caused the violation of his Eighth Amendment rights. See Hale, 50 F.3d at 1584. To do so, a plaintiff must show two causal links: "first, a link between [defendants'] allegedly deliberately indifferent acts and omissions and the excessive risk of violence; and second, a link between the excessive risk of violence and his injury." Id.

## II. Application to Plaintiff's Claim

### A. Defendants Payne and Bagley

Defendant's motion for summary judgment is **GRANTED** as to Defendants Payne and Bagley because Plaintiff's notice to these Defendants did not convey a "substantial risk" of harm. Here, Plaintiff initially alleged that his note to Officer Ruger informed Defendants Payne and Bagley of Plaintiff's April 7 altercation with Muslim inmates. Dkt. No. 62-1 ¶ 7a. This is the only altercation of which Payne and Bagley were notified of. For Eighth Amendment liability to attach, Plaintiff must show evidence that when viewed objectively, demonstrates "more than a mere possibility of serious harm." Turner, 444 F. App'x 394, 396 (11th Cir. 2011); Caldwell, 748 F.3d at 1099. Here, even if Payne and Bagley received the notice Plaintiff alleges they did, the notice does not present a "substantial risk" of harm to which these Defendants had a duty to respond.

17

The threat posed to Plaintiff by these Muslim gang members was, at best, speculative—not actual and imminent. The Muslims threatened to "beat [Plaintiff's] ass" if Plaintiff "said anything smart" at some point in the future. That threat was not imminent to Plaintiff at that time. Plaintiff would have to take another provocative and knowing action before coming to blows with the Dorm A-2 Muslim inmates. Thus, at the time, there was no reason for Payne or Bagley to believe there was anything "more than a mere possibility of serious harm" to Plaintiff because of this threat. See Turner, 444 F. App'x at 396.

Although these threats certainly may have made Plaintiff uncomfortable, "[a] prisoner's exposure to the potential for a fight" alone does not constitute a substantial risk of harm, Estate of Owens, 660 F. App'x at 767, nor does "mere discomfort," Hunt, 748 F. App'x at 900. At best, Plaintiff put Payne and Bagley on notice of a potential and conditional threat to his safety that made him uncomfortable. Such threats do not trigger Defendants Payne and Bagley's constitutional duty to protect Plaintiff.

### B. Defendants Burse and Adams

Defendants' motion for summary judgment is **GRANTED** as to Defendants Burse and Adams, because Plaintiff's notice to these Defendants likewise did not convey a "substantial risk" of harm. Here, Plaintiff initially alleged that his April 13 note to Officer Self would inform Defendants Adams and Burse of all the threats

18

specified in his grievance form. Dkt. No. 62-1 ¶ 8e. However, in his deposition, Plaintiff stated that only the grievance dated April 8, 2016 would show Defendant Adams was aware of the April 7 threats against him. Dkt. No. 32-11 at 18 ("If he read it, then he was notified. If he didn't, then he wasn't."). Additionally, when asked about Defendant Burse's specific notice of the April 7 threats, Plaintiff could confirm only that Burse received notice of the April 13 main walk incident and not the grievance form. Id. Consequently, Plaintiff has failed to show evidence, beyond mere allegations, that Defendants Burse and Adams were aware of the specific threats identified in his grievance form.

Similar to Plaintiff's notice to Defendants Payne and Bagley, Plaintiff's notice to Burse and Adams does not present a substantial risk of harm to which these Defendants had a duty to respond. See id. at 14-15 ("On the evening of the thirteenth, Floor Officer Ms. Self, I advised her that some gang members out on the sidewalk wanted me to come out there and talk to them. They was wanting to assault me is what it was."). Based on this information, any threat to Plaintiff regarding the main walk incident was speculative. See Thornton v. Jackson, 998 F. Supp. 2d 1365, 1376 (N.D. Ga. 2014) (finding that speculation regarding other inmates talking about plaintiff was not enough to establish a substantial risk of harm). Defendants Burse and Adams could not infer a

19

substantial and serious threat to Plaintiff's safety. See Turner, 444 F. App'x at 396; Estate of Owens, 660 F. App'x at 767.

### C. Defendants Lee, Saenz, Johnson and Gramiak

Unlike the Defendants discussed above, the remaining Defendants allegedly had notice of Plaintiff's grievance regarding gangs labeling Plaintiff a "snitch" and the specified threats from the Muslim and Blood gang leaders at large in WSP. Dkt. No. 42 at 6–24. Therefore, the Court continues its analysis to the elements for a constitutional violation.

### i. Substantial Risk of Serious Injury

For the remaining Defendants, Plaintiff's alleged facts would allow a reasonable juror to infer that Plaintiff faced a substantial risk of serious harm. Plaintiff's April 14 grievance indicates that he had become a target of gang members in WSP. See Dkt. No. 32-13 at 5; Dkt. No. 1 ¶ 31. One could infer that Plaintiff faced a substantial risk of being attacked by one of these two gangs. Plaintiff's grievance further states that the "Muslims are making plans to have me 'wet up' meaning stabbed!" Id. This "hit" put out on Plaintiff could create an objective risk of serious harm to Plaintiff. See Rodriguez, 508 F.3d at 618.

In response, Defendants argue that Plaintiff's grievances did not make them subjectively aware of a serious and substantial threat to his safety because he specifically asked to not be placed in protective custody. Dkt. No. 54 at 1. Indeed, it is undisputed

that Plaintiff affirmatively made a request against administration segregation or protective custody. See Dkt. 32-13 at 5. Consequently, Defendants assert that, because of this request, a reasonable juror could come to only one conclusion: Plaintiff did not face a serious risk of harm. See Mitchell v. Jackson, No. 6:17-CV-143, 2019 WL 4439504, at *9 (S.D. Ga. Aug. 14, 2019), report and recommendation adopted, No. 6:17-CV-143, 2019 WL 4437861 (S.D. Ga. Sept. 16, 2019) ("If Defendant offered to transfer Plaintiff to [protective custody] and Plaintiff refused, this fact would cut against a conclusion that Plaintiff faced a substantial risk.") However, just because an undisputed fact gives rise to a possible conclusion does not mean that summary judgment is warranted when other evidence in the record weighs against that conclusion.

Plaintiff's deposition indicates he believed protective custody would hinder him from working on his habeas corpus petition. Dkt. No. 32-13 at 5. Plaintiff instead requested other measures to alleviate his fears, such as a transfer to a different building or removal of certain gang leaders in Plaintiff's current dorm. Id. at 1.

The summary judgment standard requires evidence to be construed in the light most favorable to the nonmovant—here, Plaintiff. Shaw, 884 F.3d at 1099. Plaintiff's request against protective custody ultimately goes to Plaintiff's credibility and is properly left for the jury. See Dkt. No. 46 at 31 ("Q. If an

inmate specifically requests not to be placed in protective custody or administrative segregation, would that be a factor in determining the credibility of the warning? A. It would be.").

To be sure, a reasonable juror might conclude that Plaintiff's decision to request against protective custody or administrative segregation means that Plaintiff did not face a threat of an attack that was objectively serious and substantial. Alternatively, a reasonable juror might also choose to believe that Plaintiff's rationale not to request protective custody was solely based on his concern over his upcoming habeas case. In this view, a reasonable juror could find a substantial risk of serious injury still existed based on the evidence in the record. Summary judgment is therefore not appropriate as to this element.

### ii. Deliberate Indifference to the Risk

#### a. Subjective Component

It is undisputed Plaintiff alleged in his grievance: Plaintiff was now labeled a "snitch" in the whole dorm; this label made him a target to all gang members at Ware State Prison; his living conditions were extremely dangerous; the Muslims were making plans to have him stabbed; an identified inmate wanted to have him "smashed"; and Plaintiff planned to stop attending breakfast for fear of getting stabbed. Dkt. No. 32-13 at 1-6.

Defendants, in response, argue that Plaintiff's request against protective custody made the threat "unbelievable" and

failed to convey to Defendants that Plaintiff actually perceived an imminent risk to his safety. Dkt. No. 54 at 8. As this Court has previously held, although a defendant's statement that he "lacked belief is relevant to the inquiry, the deliberate indifference element cannot be resolved based solely on Defendants' allegations regarding their beliefs." Mitchell, 2019 WL 4439504, at *9. Otherwise, a defendant could defeat any Eighth Amendment claim by disavowing all subjective beliefs. Instead, the inquiry also focuses on whether a reasonable juror could infer from the evidence that Defendants actually knew of a substantial risk of harm to Plaintiff from other inmates. See Caldwell, 748 F.3d at 1102.

Defendant Saenz and Defendant Lee admit they both read the grievance. Saenz Dep. 163:15-20; Lee Dep. 114:15-19. Additionally, Defendant Saenz stated that she actually believed "[Plaintiff] felt there was a threat to his safety." Saenz Dep. at 178:24-25; 179:1. Defendant Lee agreed that Plaintiff set out threats to his life in his April 14 grievance. Lee Dep. 114:9-11. Given these testimonies, a reasonable juror could infer that Defendants Saenz and Lee not only read the grievance, but also actually perceived a serious risk to Plaintiff's safety by reading it.

Defendant Johnson contends that she was never aware of the grievance. See Johnson Dep. 208:11-14, 209:1-3. However, Defendant Saenz testified that Johnson read the grievance and instructed

Saenz to sign off on it. Saenz Dep. 169:5-25, 170:1-12. Thus, a factual dispute exists as to whether Defendant Johnson saw the grievance.

Like Defendant Johnson, Defendant Gramiak contends he was never aware of the grievance. Gramiak Dep. 139:1-3. However, Defendant Saenz testified that the grievance would have been sent to Warden Gramiak for final review because Defendant Johnson was listed in the grievance. Saenz Dep. 166:6-10. Reviewing the record in the light most favorable to Plaintiff, one could infer that Defendant Gramiak did receive the grievance and conducted a final review. Thus, the record also demonstrates a factual dispute as to whether Defendant Gramiak was aware of the grievance form.

Summary judgment is inappropriate where there is "[]sufficient evidence in the record to allow the Court, or a jury, to second guess [defendant's] assertion that she was not aware of a substantial risk of serious harm to Plaintiff." Chatham v. Adcock, 334 F. App'x 281, 294 (11th Cir. 2009). A reasonable juror could infer from the evidence that Defendants Gramiak and Johnson also knew of a substantial risk of harm to Plaintiff.

### b. Objective Component

Defendants maintain that they acted reasonably due to Plaintiff's request against protective custody and administrative segregation. However, Plaintiff's request does not imply, as a matter of law, that doing nothing is a reasonable approach in light

of the threats made against Plaintiff. While it holds true that Defendants cannot be liable solely for their violation of a policy or procedure, there is little evidence here that any affirmative steps were taken to protect Plaintiff. Consequently, a genuine dispute of material fact remains as to whether Defendants failed to reasonably respond by declining to take any further action to protect Plaintiff against a threat of harm. Cf. Days, 701 F. App'x 883, 886 (11th Cir. 2017) (finding no deliberate indifference because the prison officials there "(1) opened an investigation into [plaintiff]'s allegations; (2) moved [plaintiff] to Y dorm, where [plaintiff] himself felt safe; and (3) transferred plaintiff to kitchen duty, where plaintiff also felt safe"); Walker v. Smokes, No. 6:15-CV-57, 2019 WL 3919064, at *4 (S.D. Ga. Aug. 19, 2019) (citations omitted) (placing plaintiff in Tier II confinement constituted sufficient safeguards for purposes of a deliberate indifference claim).

### iii. Causation

Finally, Plaintiff must prove "a causal connection between the prison official's conduct and the Eighth Amendment violation." Rodriguez, 508 F.3d at 617. Defendants allege that Plaintiff has failed to prove causation for two reasons: (1) administrative segregation would have been the exact place Defendants placed Plaintiff, so even if Defendants had reasonably responded, Plaintiff would have still been attacked; and (2) neither of

25

Plaintiff's assailants were a member of the two groups Plaintiff contends threatened him.

To determine whether Defendants caused Plaintiff's injury, we look at Defendants' "duties, discretion and means." Rodriguez, 508 F.3d at 622 (11th Cir. 2007). Here, Defendants contend that Plaintiff cannot establish causation because after Plaintiff's transfer to administrative segregation, he was still assaulted, and administrative segregation was the same treatment he would have initially received even if he *had* requested protective custody.[3] Dkt. No. 54 at 12. However, this overlooks testimony in the record stating otherwise.

Both Defendants Johnson and Gramiak said in their depositions that they had the means to lock Plaintiff up in involuntary protective custody and would likely have done so if they had seen the grievance.[4] Johnson Dep. 230:1-12; Gramiak Dep. 153:23-25, 154:1-2 ("Q: The fact that he's saying I don't want protective custody doesn't mean you just don't follow-up on it? A: No, that doesn't mean you don't follow up on it."). Because there is a factual dispute as to whether either one of these Defendants saw the grievance, it follows that a factual dispute also exists as to

---

[3] After the April 20 attack, Plaintiff was placed in a two-man cell in administrative segregation with verified gang member. On April 25, he was attacked again by his cellmate in administrative segregation. Dkt. No. 42-2 ¶ 71.

[4] As noted by Defendant Gramiak, in a scenario where there is a substantial threat against an inmate and that inmate does not want to go into protective custody, prison officials may still place the inmate under protective custody known as "involuntary" protective custody. Dkt. No. 42-2 ¶ 47(d).

a "necessary causal link." Rodriguez, 508 F.3d at 622 ("[A] plaintiff demonstrates the 'necessary causal link' where he is able to show that the prison official (1) 'had the means substantially to improve' the inmate's safety, (2) 'knew that the actions he undertook would be insufficient to provide [the inmate] with reasonable protection from violence,' and (3) had '*other means ... available to him* which he nevertheless disregarded.'" (quoting LaMarca v. Turner, 995 F.2d 1526, 1539 (11th Cir. 1993) (emphasis added))).

As discussed above, a factual dispute exists as to whether Defendant Johnson received the grievance form from Defendant Saenz. Saenz Dep. 169:5-25, 170:1-12. It is undisputed, however, that Defendant Saenz's signature is on the grievance response form. Id. Thus, a jury could also find that Defendant Saenz failed to pass along the threats against Plaintiff, and that this failure constituted deliberate indifference that caused Plaintiff's harm. Here, the evidence in the record is sufficient to permit a reasonable juror to find that the "necessary causal link" has been established.

Defendant Lee contends that Plaintiff cannot prove causation in her case because she did not have any power to help Plaintiff other than processing and delivering the grievance as she did. Lee Dep. 114-18. However, this overlooks other testimony in the record that notes a considerable amount of action Lee could have taken to

improve Plaintiff's situation. Lee was obligated to alert security; Lee recommended the grievance be rejected; and Lee failed to actually flag the security concerns for her supervisor. See Gramiak Dep. 134:24-25, 135:1-12. Therefore, a reasonable juror could find that Defendant Lee failed to use considerable means available to her that could have substantially improved Plaintiff's safety.

Plaintiff is also required to show a causal link between the excessive risk of violence and his injury. See Hale, 50 F.3d at 1584. Defendants argue that Plaintiff has failed to establish this second causal link because, while his assailants were members of a gang, neither was a member of either the Bloods or the Muslims, the two groups Plaintiff contends had threatened him. See Dkt. No. 37-11 at 22. In response, Plaintiff points to his deposition where he testifies that after his April 20 attack, Plaintiff's assailant said: "We're going to split your fucking head open every time you hit the fucking compound, you snitch." Id. at 12. Additionally, during the April 25 attack, Plaintiff's assailant said, "this is for the Muslims, you snitch." Id. at 22. Plaintiff has carried his burden by pointing to specific evidence found in the record. Viewing the evidence in the light most favorable to Plaintiff, these statements create a genuine dispute of material fact as to the link between Plaintiff's feared threat of harm and the injuries that actually occurred.

28

### III. Clearly Established Law

Even when there is a genuine factual dispute as to whether a constitutional violation occurred, if the defendant did not act in violation of clearly established law, then the claim will not proceed past summary judgment. See Ansley v. Heinrich, 925 F.2d 1339, 1348 (11th Cir. 1991) ("[I]f the law is not clearly established, the official is entitled to summary judgment regardless of factual disputes." (quoting Harlow, 457 U.S. at 818)).

The "clearly established" requirement is designed to ensure that officers have fair notice of the conduct which is proscribed. Hope v. Pelzer, 536 U.S. 730, 739 (2002). Therefore, "[f]or a constitutional right to be clearly established, its contours 'must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" Id. (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)). A plaintiff can demonstrate that the contours of the allegedly violated constitutional right were clearly established in at least two ways. Cottone, 326 F.3d at 1359. First, a plaintiff "may show that 'a materially similar case has already been decided.'" Id. (quoting Mercado v. City of Orlando, 407 F.3d 1152, 1159 (11th Cir. 2005)). Second, a plaintiff "can point to a 'broader, clearly established principle [that] should control the novel facts [of the]

situation.'" Id. (quoting Mercado, 407 F.3d at 1159); accord United States v. Lanier, 520 U.S. 259, 271 (1997) ("[G]eneral statements of the law are not inherently incapable of giving fair and clear warning, and in other instances a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question.").

"Some broad statements of principle in case law are not tied to particularized facts and can clearly establish law applicable in the future to different sets of detailed facts." Terrell v. Smith, 668 F.3d 1244, 1256 (11th Cir. 2012) (quoting Vinyard v. Wilson, 311 F.3d 1340, 1351 (11th Cir. 2002)). Here, the broader principles laid down in Farmer v. Brennan "control the novel facts" set forth by Plaintiff. See 511 U.S. 825 (1994). Additionally, it is clearly established in this Circuit that Defendants' total failure to investigate or mitigate the substantial risk of serious harm to Plaintiff constitutes deliberate indifference. See, e.g., Marsh v. Butler Cnty., 268 F.3d 1014, 1034 (11th Cir. 2001) (en banc) ("[A]t the time of the assaults in this case, it was clearly established in this Circuit that it is an unreasonable response for an official to do nothing when confronted with prison conditions—like the conditions alleged in this case—that pose a risk of serious physical harm to inmates.").

In Farmer, the Supreme Court made clear "that prison officials have a duty 'to protect prisoners from violence at the hands of

other prisoners' and that an official may be liable if he knows of and disregards a substantial risk of an inmate-on-inmate attack 'by failing to take reasonable measures to abate [the risk].'" Scott v. Miami Dade Cnty., 657 F. App'x 877, 885 (11th Cir. 2016) (quoting Farmer, 511 U.S. at 833). Vital to its holding was the Court's admonition that "having stripped [prisoners] of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course." Farmer, 511 U.S. at 833.

Based on the broader principle laid down in Farmer, the Eleventh Circuit concluded in Scott v. Miami Dade that "it was clearly established that a prison official violates an inmate's constitutional rights where the official is aware of a substantial risk of serious harm to an inmate, including an inmate-on-inmate attack, *and takes no action*." 657 F. App'x at 885 (emphasis added). Additionally, the Eleventh Circuit explained in Caldwell that a prison official is not entitled to qualified immunity if the official "actually (objectively and subjectively) knows that [other inmates] pose[] a substantial risk of serious harm to another, *yet fails to take any action to investigate, mitigate, or monitor that substantial risk of serious harm*." Caldwell, 748 F.3d 1090 at 1102 (emphasis added) (citing Cottone, 326 F.3d at 1358–60). Finally, in Bowen v. Warden Baldwin State Prison, 826 F.3d 1312, 1325 (11th Cir. 2016), the Eleventh Circuit found that as of

31

March 2010, "the law of this Circuit, as expressed in <u>Cottone</u>, clearly established that the defendants' *total failure to investigate—or take any other action to mitigate*—the substantial risk of serious harm that [an inmate] posed to [the plaintiff] constituted deliberate indifference to [the plaintiff's constitutional] rights." (emphasis added).

Defendants rely on <u>Mitchell v. Jackson</u>, 2019 WL 4439504, at *2, to support their contention that qualified immunity applies. Dkt. No. 54 at 18. This court in <u>Mitchell</u> found that the Defendant was entitled to qualified immunity in a case involving alleged threats of a gang hit related to contraband disputes. <u>Id.</u> The <u>Mitchell</u> decision turned in large part on the unique self-locking mechanism found in the plaintiff's cell. <u>Id.</u> at *14. As such, Defendants contend that Mitchell is instructive and should come out the same way. Dkt. No. 60 at 5 ("<u>Mitchell</u> is instructive here — replace the self-locking mechanism with the unique fact circumstance of Plaintiff's express and emphatic rejection of protective custody and the cases are strikingly similar.").

However, <u>Mitchell</u> did not involve a situation where the Defendant failed to take any action to investigate or mitigate the potential harm. The Defendant in <u>Mitchell</u> tried to move the plaintiff to a different cell but was unable to due to security clearance. <u>Id.</u> at *2. Additionally, the defendant told plaintiff she would look into having the guards lock external doors to the

holding area. Id. at *3. And finally, as the Court noted in Mitchell, the plaintiff's situation was unique because he "was not 'stripped ... of virtually every means of self-protection' because Plaintiff could lock himself inside of his single-man cell." Id. at *14 (quoting Farmer, 511 U.S. at 833).

Under Plaintiff's version of the facts, Defendants Lee, Saenz, Johnson, and Gramiak took no action to protect Plaintiff despite their knowledge of gang threats to harm Plaintiff and their ability to take protective action. Dkt. No. 42-2 ¶ 29. Additionally, unlike Mitchell, Defendants fail to demonstrate any efforts or attempts to investigate Plaintiff's claim or provide any form of unique protection. Cf. Mosley v. Zachery, 966 F.3d 1265, 1275 (11th Cir. 2020) (granting summary judgment where the defendant told plaintiff she would look into a dorm transfer, called a cell count, and provided a self-locking cell to the plaintiff).

Defendants further argue that there is no clearly established law on the facts particular to this case. Dkt. No. 54 at 16. Specifically, Defendants contend that Plaintiff's request against protective custody warrants qualified immunity to apply because it is a unique fact not found in other cases. Id. at 18.[5]

---

[5] As previously noted, Defendants' argument on this point goes to the factual question of whether they subjectively recognized the threat voiced in Plaintiff's grievance. Genuine disputes of fact exist as to whether any Defendant subjectively discounted Plaintiff's grievance because of his specific request. A reasonable juror could conclude that Plaintiff's grievance provided

However, the qualified immunity analysis is not so granular as to require that Plaintiff identify a controlling case with identical facts. See Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1277 (11th Cir. 2004) ("[T]here need not be a case 'on all fours,' with materially identical facts, before we will allow suits against them."). Instead, the law was clearly established in 2016 that prison officials have a duty to afford inmates at least some form of response to or protection from a known danger, including violence exacted by other inmates. See Bowen, 826 F.3d at 1325.

Plaintiff here was the victim of inmate-on-inmate violence. Dkt. No. 42-2 ¶ 61. He told officials about the likelihood of such an attack. Id. ¶ 28. Defendants—like the officials in Caldwell and Farmer—did nothing to protect him. Id. ¶ 29. Each remaining Defendant acknowledges that at least something should have been done regarding Plaintiff's grievance. See Dkt. No. 47 at 183;[6] Dkt. No. 48 at 53; Dkt. No. 49 at 38; Dkt. No. 43 at 32.[7] Yet, not a single Defendant acted to investigate or mitigate Plaintiff's

awareness (both subjective and objective) of a serious threat felt by the Plaintiff. "A gang's threat to kill someone for leaving the gang (or really for almost any other reason) could reasonably be considered . . . credible." Woodyard v. Alabama Dep't of Corr., 700 F. App'x 927, 933 (11th Cir. 2017)(emphasis added)(discussing Rodriguez, 508 F.3d at 618).

[6] Defendant Saenz agrees that the grievance should have been passed on to security but claims she believed that Defendant Johnson had already done so. Id.

[7] Defendant Lee claims that she did everything she was authorized to do by passing the grievance up her chain of command. Id. However, testimony by Defendant Johnson contradicts this statement. Johnson Dep. 163:1-14; Dkt. No. 48 at 42.

situation. See Dkt. No. 47 at 183; Dkt. No. 48 at 53; Dkt. No. 49 at 34; Dkt. No. 43 at 31-32.

The failure to at least act, mitigate, or investigate Plaintiff's situation amounts to sitting back and letting "the state of nature take its course." Farmer, 511 U.S. at 833. No reasonable jailer could conclude that it was constitutionally permissible to do *nothing* despite awareness of specified gang threats and the motivation behind such threats. See Caldwell, 748 F.3d 1090 at 1102; Rodriguez, 508 F.3d at 617 n. 12.

While the opinions in Miami Dade and Bowen were handed down after April 2016 and were therefore not clearly established law at the time of the altercation, the cases demonstrate that the binding authority of Farmer, Cottone, and Caldwell was established with sufficient clarity to guide Defendants at the time. Based on the facts analyzed in a light most favorable to Plaintiff, Defendants are not entitled to qualified immunity on Plaintiff's deliberate indifference claim.

**CONCLUSION**

For the above reasons, Defendants' Joint Motion for Summary Judgment, dkt. no. 32, is **GRANTED in part** and **DENIED in part**. Defendants' motion is **GRANTED** as to Plaintiff's claims against Defendants Payne, Bagley, Burse, and Adams. Defendants' motion is **DENIED** as to Plaintiff's claims against Defendants Lee, Saenz, Johnson, and Gramiak.

**SO ORDERED**, this 16th day of October, 2020.


_____

HON. LISA GODBEY WOOD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA